

# United States Department of the Interior

OFFICE OF THE SOLICITOR
Washington, D.C. 20240

IN REPLY REFER TO:

May 3, 2002

Anthony H. Gamboa
General Counsel
U.S. General Accounting Office
441 G Street, NW
Washington, D.C. 20548

Attention: Louis Chiarella, Esq.

Re: <u>Starfleet Marine Transportation, Inc.</u>, B-290181

The U.S. Department of the Interior (DOI) files this report in response to the protest of Starfleet Marine Transportation, Inc. (Starfleet) filed March 28, 2002, with your office. Starfleet challenges the decision of the National Park Service (NPS) to cancel a prospectus for concession proposals to provide ferry boat service at Fort Sumter National Monument, as well as the NPS's extensions of the incumbent concessioner's concession contract.

## JURISDICTION:

As a threshold issue, we stated in our letter of April 3, 2002, DOI reiterates its position that the General Accounting Office (GAO) does not have jurisdiction to hear this protest. The contract at issue in this protest is a concession contract, and not a procurement contract, over which the GAO has jurisdiction.

The Competition in Contracting Act (CICA) authorizes the Comptroller General to decide "protest[s] concerning an alleged violation of a procurement statute or regulation." 31 USC 3552. CICA defines a protest as "a written objection by an interested party to ... a solicitation or other request by a Federal agency for offers for a **contract for the procurement of property or services**... [or] ... the cancellation of such a solicitation or other request...." 31 U.S.C. 3551 (emphasis added). By statue, the Comptroller General's jurisdiction exists only with respect to challenges to solicitations of <u>procurement contracts</u>.

Court precedent has established that National Park Service concession contracts, such as the one

-1-

EXHIBIT

1

at issue here, are not procurement contracts. <u>Amfac Resorts, L.L.C., et al v. Dep't of the Interior</u>, 282 F.3d 818, 834-35 (D.C. Cir. 2002), *aff'g* 142 F.Supp.2d 54 (D.C. 2001); <u>YRT Servs. Corp. v. United States</u>, 28 Fed. Cl. 366, 392 n.23 (1993). Therefore, the Comptroller General has no authority to entertain this challenge.

The protester's key assumption, with respect to the jurisdiction of the Comptroller General, is that NPS concession contracts are considered to be "procurement contracts." Based upon this assumption, NPS concession contracts would be subject to the various laws governing procurement contracts, such as CICA, the Contracts Disputes Act and the Federal Acquisition Regulations. This assumption of the protester's is fundamentally flawed.

First, NPS regulations governing concession contracts clearly state that "[c]oncession contracts are not contracts within the meaning of 41 U.S.C. 601 et seq. (the Contract Disputes Act) and are not service or procurement contracts within the meaning of statutes, regulations or policies that apply only to federal service contracts or other types of federal procurement actions." 36 CFR 51.3. Second, court precedent has established that National Park Service concession contracts, such as the one at issue here, are not procurement contracts. <u>Amfac Resorts, L.L.C., et al v. Dep't of the Interior</u>, 282 F.3d 818, 834-35 (D.C. Cir. 2002), *aff'g* 142 F.Supp.2d 54 (D.C. 2001); <u>YRT Servs. Corp. v. United States</u>, 28 Fed. Cl. 366, 392 n.23 (1993). Indeed, both courts upheld the validity of NPS's regulation. <u>Amfac Resorts, L.L.C.</u>, 282 F.3d at 835 ("With this we agree."); <u>YRT Servs.Corp.</u>, 28 Fed. Cl. at 392-3 and n. 23.[1] Therefore, the Comptroller General has no authority to entertain this challenge.

<u>Amfac Resorts, L.L.C.</u> is instructive of the differences between procurement and concession contracts. Procurement contracts are contracts "for which the government bargains for, and pays for, and receives goods and services." <u>Amfac Resorts, L.L.C.</u>, 282 F.3d at 835. Concession contracts do not procure services or goods for the government. Rather, concession contracts "authorize third parties to provide services to park area visitors." <u>Id</u>.[2] NPS concession contracts

---

[1] Reliance on YRT Services is appropriate as the question is of the nature of a concession contract, not the nature of the selection process. See <u>Amfac Resorts L.L.C.</u>, 282 F.3d at 835.

[2] Despite protester's assertion to the contrary, the NPS notes that concession contracts and concession permits are treated similarly pursuant to the Concessions Policy Act of 1965 and the Concessions Management Improvement Act of 1998. The 1992 regulations implementing the 1965 Act state: "The Director authorizes concession operations by both contracts and permits. Contracts are used for larger operations and permits for those of less complexity. Throughout this document, wherever the terms contract or concession contract are used, they shall .. refer to both types of authorization documents." Pursuant to the 1998 Act, the NPS will be using concession contracts of varying complexity to authorize activities formerly authorized by permit. See 65 Fed.

are governed by the Concessions Management Improvement Act of 1998, 16 U.S.C. 5951 et seq., (the 1998 Act), which repealed and replaced the Concessions Policy Act of 1965, 16 U.S.C. 20 et seq. In enacting these procedures for the solicitation, award and management of concession contracts, Congress expressly established that the NPS may enter into concession contracts "to authorize a person, corporation or other entity to provide accommodations, facilities and services to visitors to" national parks. 16 U.S.C. s 5952; Amfac Resorts, L.L.C., 282 F.3d at 835. Furthermore, as the Court of Appeals noted:

> The Committee reports accompanying the 1998 Act also concluded that concession "contracts do not constitute contracts for the procurement of goods and services for the benefit of the government or otherwise," S. Rep. No. 105-202, at 39 (1998); H.R. Rep. No. 105-767, at 43 (1998), a position the Park Service had reached earlier with respect to concession contracts under the 1965 Act. See, e.g., Concessions Contracts and Permits, 57 Fed. Reg. 40,496, at 40,498 (Sept. 3, 1992) (reiterating that the Park Service "has never considered [concessions contracts] a type of federal procurement contract"). Id.

The Court of Federal Claims, "considering the nature of concession contracts, also concluded that 'this arrangement does not constitute a procurement, but is a grant of a permit to operate a business.'" Id. citing YRT Servs. Corp., 28 Fed. Cl. at 392 n.23. Despite protester's lengthy assertions to the contrary, the fact "[t]hat the government receives monetary compensation or incidental benefits from the concessioners' performance is not enough to sweep these contracts into the ambit of" procurement statues. Amfac Resorts, L.L.C., 282 F.3d at 384.[3] Although the Court of Appeals specifically addressed the issue of the applicability of the Contract Disputes Act, the CDA applies, as does the CICA, to any contract for the "procurement" of "property," or "services" 41 U.S.C 602(a)(2). The definition of a procurement contract in each of these statutes is the same. Therefore, if concession contracts are not considered procurement contracts pursuant to CDA, then they cannot be considered to be procurement contracts pursuant to CICA.

The protester, essentially ignoring the decision of the Court of Appeals, attempts to make an argument that the concession contract is a procurement contract by citing to the language of the statute, repeated in the prospectus, that the NPS may authorize only those activities by concessioners that "are necessary and appropriate for public use and enjoyment" of the park. 16 U.S.C. 5951(b). However, the protester misunderstands the NPS mission. The NPS may

---

Reg. 44894 (July 19, 2000) (establishing simplified concessions contracts).

[3]Note that the contracts considered by the Court of Appeals in Amfac Resorts L.L.C. were contracts authorizing a complete array of visitor services, including hotel, food, retail, touring and other visitor services.

-3-

authorize businesses to provide "necessary and appropriate" services to visitors pursuant to the 1998 and 1965 Acts, but the NPS is not <u>required</u> to provide such services. At most, NPS is required to protect and preserve the environment of the parks. 16 U.S.C. 1. The "primary purpose of concessions contracts is to permit visitors to enjoy national parks in a manner consistent with preservation of the parks. 16 U.S.C. 5951." <u>Amfac Resorts, L.L.C.</u>, 282 F.3d at 384.

Furthermore, and importantly, the CICA itself expressly does not apply in circumstances in which alternate procedures for the solicitation and award of particular contracts is provided. 41 USC 253; <u>YRT Servs. Corp.</u>, 28 Fed. Cl. at 392. Obviously, alternative procedures for concession contracts are provided by the 1998 Act.

The protester, in support of its misunderstanding, cites to Comptroller General opinions, each of which is readily distinguishable from the case at hand. <u>TCA Reservations, Inc.</u>, B-222575, Aug. 20, 1986, 86-2 CPD ¶ 202, and <u>Alpine Camping Services</u>, B-238625.2, June 22, 1990, 90-21 CPD ¶ 580, both concerned U.S. Forest Service concession contracts, and neither was issued pursuant to the authority of the 1998 Act or its predecessor statute. Indeed, the Forest Service does not have a statute establishing procedures for concession contracts. Even the NPS contract at issue in the case cited as authority in <u>TCA Reservations, Inc.</u>, <u>supra</u> was not entered into pursuant to the statutory framework relevant here. (See <u>Washington National Arena Limited Partnershp</u>, B-219136, Oct. 22, 1985, 85-2 CPD ¶ 435).

The protester also relies on an Interior Board of Contract Appeals (IBCA) case (<u>Appeal of Watch Hill Concession, Inc.</u>, IBCA No. 4284-2000, 01-1 IBCA ¶ 31,298 (Feb. 16, 2001)), in support of its position that concession contracts are procurement contracts. To the extent <u>Watch Hill</u> stands for this proposition, the IBCA is incorrect as a matter of law. The Court of Appeals noted this error when it specifically addressed various IBCA decisions, including <u>Watch Hill</u>, stating, "decisions of this body 'on any question of law shall not be final or conclusive.' " <u>Amfac Resorts, L.L.C.</u>, 282 F.3d at 385 citing 41 U.S.C. 609(b). The Court of Appeals further found, "IBCA's rationale for determining that concession contracts are procurement contracts is flawed." <u>Id</u>. We agree with that assessment. Finally, and importantly, all decisions cited by protester predate the Court of Appeals decision issued March 1, 2002, in <u>Amfac Resorts L.L.C.</u> and discussed above.

For these reasons, the U.S. Department of the Interior again respectfully requests that GAO dismiss the bid protest filed by Starfleet Marine Transportation, Inc., on jurisdictional grounds.


**FACTS:**

The NPS entered into a concession contract for the provision of ferry boat services to Fort Sumter National Monument (Monument) on June 13, 1986. The contract, originally to expire on

December 31, 2000, has been extended three times (in December 2000, March 2001, and December 2001), through December 31, 2002.

On December 13, 2001, the NPS advertised the availability of a prospectus for the award of a concession contract authorizing ferry boat transportation service at Fort Sumter National Monument. See CBD notice of 12/13/01. The NPS issued the prospectus in accordance with the Concessions Management Improvement Act of 1998, 16 U.S.C. 5951 et seq. and 36 CFR Part 51. See Prospectus, Proposal Instructions (SF 113-9). Initially, proposals in response to the prospectus were due March 13, 2002, however, the NPS extended the date until April 29, 2002. See FedBizOpps notice of 3/8/02.

The prospectus provided that the new concessioner would be authorized to provide ferry boat services to visitors to the Monument embarking solely from Liberty Square, the docking facility within park boundaries owned by the NPS. See Prospectus, Business Opportunity (SF 011) and draft concession contract (SF 36). Construction of Liberty Square was completed in 2000. Prior to completion of Liberty Square, the concession ferry boats embarked to the Monument from both Patriots Point, Mount Pleasant, and City Center, Charleston, two locations outside park boundaries. Both the Fort Sumter General Management Plan (1998) (GMP) and the Commercial Services Plan (2000) (CSP) provide for embarkation to the Monument solely from Liberty Square. See General Management Plan, Fort Sumter National Monument (1998), Commercial Services Plan (2000). In response to concerns raised by individuals commenting on the Commercial Services Plan, NPS specifically contemplates a ferry/taxi boat service connecting visitors from Patriots Point to Liberty Square. See CSP at 19.

The prospectus further stated "In the future, National Park Service may choose to authorize ferry boat services to Fort Sumter from alternate locations. National Park Service may do this through separate authorization or may choose, pursuant to mutually agreed upon contract amendment, to authorize the concessioner to provide this service." See Prospectus, Business Opportunity (SF11).

After issuance of the prospectus, the NPS received a number of inquiries from members of Congress regarding embarkation from Patriots Point. See, e.g., Letter from Congressmen Radanovich, Hansen, Hefley, Brown, Graham, Duncan of 12/19/01. In addition, the NPS received inquiries from individuals interested in submitting proposals for the concession opportunity regarding the embarkation issue. See, e.g., Letter from M Gomel of 3/11/02; Letter to R. Zenenick of 1/23/02; Letter from B. Horn of 1/17/02. All raised questions regarding the language of the prospectus relating to alternate locations.

In order to attempt to better explain this language in the prospectus, on March 8, 2002 the NPS published in Federal Business Opportunities (FedBizOpps) notice that it was extending the closing date of March 13, 2002 until April 29, 2002. See FedBizOpps notice of 3/8/02. The extension

was done to allow time for the NPS to examine the language in the prospectus. See id.; Benedetti memo of 5/2/02

NPS officials subsequently met and the Director determined that in light of the issues raised by members of the public and the Congress, it was appropriate in the public interest to cancel the prospectus and review the circumstances of the embarkation issue before reissuing the prospectus. *See Press Release of 3/19/02; Statement of Relevant Facts.*   This review, which is currently underway, includes a review of the planning documents, such as the GMP and the CSP. Id. As a result of this determination, on March 19, 2002, the NPS published in the FedBizOpps a notice that NPS was canceling the Fort Sumter prospectus in accordance with 36 CFR 51.11.  See FedBizOpps notice of 3/19/02.

At this time, the contract for Fort Sumter Tours, Inc. (FST), the current concessioner, has been extended through December 31, 2002. See Letter of Extension of 12/18/02.  Although the press release issued March 19, 2001 states that "[i]n the interim, the contract for Fort Sumter Tours, Inc., the current concessioner, will be extended until December 31, 2003," the contract, in fact, has not been so extended, pending results of the review.  No final administrative decision has been made with respect to such an extension. Any decision to extend the Fort Sumter Tours contract further will be done in accordance with 36 CFR Part 51.


**LEGAL ISSUES:**

1.  Extensions of FST's contract were appropriate in accordance with the1998 Act

As an initial matter, GAO should not entertain the raised issue of contract extension. This issue is a matter of contract administration, not within the jurisdiction of GAO. 4 CFR 21.5(a).

Even if the GAO believes that this issue is within the jurisdiction of GAO, any protests of NPS's extensions of the FST contract in December, 2000, March 2001, and December, 2001, are untimely. Protests must be filed not later than 10 days after the basis of protest is known or should have been known. 4 CFR 21.2(a)(2).  Furthermore, the FST contract has not been extended beyond December 31, 2002, regardless of language contained in its press release.  Any decision that may be made to extend the FST contract after December 31, 2002 will be made in accordance with 36 CFR Part 51. Therefore, as no extension exists against which the protester may lodge a timely challenge, GAO should dismiss this protest as untimely.  4 CFR 21.5.

Even if the GAO believes that this issue is timely raised, the protest must fail as NPS complied with the terms of the 1998 Act.  The argument of protester is simply that the NPS's extensions of the FST concession contract were made "without the use of competitive bids," and therefore constitute "illegal sole source procurements."  However, NPS enters into concession contracts in

accordance with the 1998 Act.   As protester recognizes, the 1998 Act specifically provides for
the Director to extend an existing contract without public solicitation:

> Notwithstanding the provisions of this section, the Secretary may award, without
> public solicitation, the following: (A) ...[A]n extension of an existing concessions
> contract for a term not to exceed 3 years in order to avoid interruption of services
> to the public at a unit of the National Park System, except that prior to making
> such an award, the Secretary shall take all reasonable and appropriate steps to
> consider alternatives to avoid such interruption. 16 U.S.C. 5953(11).

This provision of the 1998 Act authorizes NPS to extend concession contracts without
solicitation.  Furthermore, it is this statute, and not the Competition in Contracting Act, that
controls in this regard. 41 USC 253; YRT Services, 28 Fed. Cl. at 392, see also discussion above.

With respect to the extensions entered into in December 2000, March 2001, and December 2001,
each was entered into in accordance with law.  The December, 2000 extension was entered into
pursuant to P.L. 106-554 (Dec. 21, 2000) which directed that the contract be extended
immediately by the NPS. [cite language]  Both the March 2001 contract extension and the
December, 2001, extension were made in accordance with the 1998 Act and 36 CFR 51.23.  Due
to enactment of the 1998 Act, and the time necessary to issue prospectuses, the determination
was made that extension of the contract was appropriate.  See 66 Fed. Reg. 67297-01 (December
28, 2001) ("The National Park Service has determined that the proposed short-term extensions
are necessary in order to avoid interruption of visitor services and has taken all reasonable and
appropriate steps to consider alternatives to avoid such interruption. These extensions will allow
the National Park Service to complete and issue prospectuses leading to the competitive selection
of concessioners for new long-term concession contracts covering these operations.")   As each
extension was consistent with the 1998 Act, no competitive solicitation was required. [4]


2.  NPS's cancellation of the Prospectus was valid, based upon decision of NPS to review the
GMP and CSP.

On December 13, 2000, the NPS issued its prospectus pursuant to the 1998 Act and 36 CFR Part

---

[4]  With respect to protester's assertion that DOI has stated that an extension of a contract
was a material modification, protester misreads DOI's letter of October 23, 2000, to Congress.
This letter did not relate to contract extensions. In that letter, DOI stated that a requirement in
proposed legislation (S. 2331) for the NPS to engage in binding arbitration with a concessioner
would be a material modification of the existing contract because that existing contract expressly
provided for non-binding arbitration. See Section 9(e) of FST's concession contract.

51. On March 19, 2001, NPS canceled the prospectus pursuant to 36 CFR 51.11. 36 CFR 51.11 states:

> The Director may cancel a solicitation at any time prior to award of the concession contract if the Director determines in his discretion that this action is appropriate in the public interest. No offeror or other person will obtain compensable or other legal rights as a result of an amended, extended, canceled or resolicited solicitation for a concession contract.

This language provision was expressly included in the prospectus. See prospectus, Proposal Instructions, p. 9 (SF 118). After NPS issued the prospectus, NPS received a number of inquiries from members of Congress regarding embarkation from Patriots Point. In addition, the NPS received inquiries from individuals interested in submitting proposals for the concession opportunity regarding the embarkation issue. All raised questions regarding the language of the prospectus relating to alternate embarkation locations.

After reviewing the inquiries, the Director determined that in light of the issues raised by members of the public and the Congress, it was appropriate in the public interest to cancel the prospectus and review the circumstances of the embarkation issue before reissuing the prospectus. This review, which is currently underway, includes a review of the planning documents, such as the GMP and the CSP. This administrative decision was within the Director's discretion and was based upon the facts presented.

The NPS certainly does not dispute that members of Congress were interested in this prospectus and were concerned about issues of accessability for the public to the Monument from Patriots Point. These members expressed legislative interest in issues impacting the public and their constituents. Congressional interest in the activities of federal agencies occurs frequently as part of Congress' oversight responsibilities. The fact that the Director determined that it would be in the public interest to further study the issue of embarkation sites can hardly be called an abuse of discretion. The fact that concerns of legislators were taken into account does not make a decision of the Director inappropriate.

The cases cited by protester regarding improper congressional interference concern an agency investigatory proceeding, an agency determination of eligibility of particular tribal corporations for land selection, and an agency debarment process in which a particular contractor was prejudicially impacted. In this case, the Director made a discretionary public policy decision, in accordance with a regulation that expressly provides for such an action, to cancel a prospectus for a concession opportunity pending review of the planning documents for the park. This is not a case in which there is a judicial, quasi-judicial or investigatory proceeding. This case furthermore is not a case in which a particular contractor is prejudicially impacted. The cancellation of the prospectus will allow appropriate administrative time for the NPS officials to review the GMP and

CSP, specifically addressing issues regarding the embarkation points.

Further, no harm will come from this decision. NPS has merely withdrawn the prospectus to consider planning issues that impact the future concession operation. The NPS will reissue the prospectus and protester will have the opportunity to bid on the contract at that time.[5] NPS also notes that by canceling the solicitation at this time, NPS has not prevented protester from competing when the prospectus is reissued. Furthermore, the cost of preparation of the protester's proposal will not be lost, as the new prospectus likely will request similar information (such as financial and management records of offeror).

The decision to cancel the prospectus was appropriately made by the Director in her discretion. Any final decision on the reissuance of the prospectus will be made based on NPS's own independent and detailed analysis of the issues.

CONCLUSION:

NPS concession contracts are governed by the NPS Concessions Management Improvement Act of 1998, 16 U.S.C. 5951 et seq. and 36 CFR Part 51. NPS concession contracts are not procurement contracts within the meaning of statues, regulations or policies that apply only to federal procurement actions. As such, GAO, which derives its authority from the Competition in Contracting Act, a statute applying only to federal procurement actions, does not have jurisdiction to hear this protest.

Nevertheless, NPS made its decisions to issue a prospectus and to cancel the prospectus in the public interest in accordance with the 1998 Act and its implementing regulations. Similarly, NPS made its decisions to extend the FST concession contract appropriately and in accordance with the 1998 Act and its implementing regulations. The fact that the Director's determination to cancel the prospectus considered Congressional requests does not make the decision arbitrary or inappropriate. The Director reviewed the facts and determined in her discretion that it would be in the public interest to cancel the prospectus to further study the issue of embarkation sites.

We are providing a copy of the agency report to the protester and interested party. While we have enclosed, in chronological order, those documents being produced in response to the protester's document request, their inclusion should not be taken as an indication of relevance to

---

[5] NPS notes that it published notice of extension of the due date for proposals to April 29, 2002, on March 8, 2002, in the FedBizOpps, which serves as notice to all prospective offerors. Only Starfleet Marine Transportation submitted its proposal prior to the due date of April 29, 2002. Starfleet Marine Transportation's proposal was returned unopened soon after receipt.

the protest grounds. This letter contains citations to all documents which we believe are relevant. We are not requesting that any documents be made subject to a GAO protective order.

Respectfully submitted,

Hugo Teufel
Associate Solicitor
Division of General Law

Alton Woods
Assistant Solicitor
Branch of Procurement and Patents
Division of General Law

Sherry Kinland Kaswell
Attorney Advisor
Branch of Procurement and Patents
Division of General Law

Pamela L. Barkin
Attorney Advisor
Branch of National Parks
Division of Parks and Wildlife

cc:   Deborah Y. Ho, Esq.
Brand & Frulla
923 Fifteenth Street, NW
Washington, D.C. 20005

William P. Horn, Esq.
Birch, Horton, Bittner and Cherot
1155 Connecticut Ave., N.W.
Washington, D.C. 20036